# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Adam W. Anderson, a Task Force Officer with the Drug Enforcement Administration ("DEA"), United States Department of Justice, being first duly sworn, depose and state underoath as follows:

1. This affidavit is made in support of criminal complaints against Thaer MUSTAFA (hereinafter, "MUSTAFA") and Elyssia SANABRIA (hereinafter, "SANABRIA"), charging that on or about February 26, 2025, MUSTAFA and SANABRIA violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), in that each knowingly possessed a schedule I controlled substance with the intent to distribute.

## TRAINING AND EXPERIENCE

2. I am a State Trooper with approximately eighteen years of law enforcement experience and have been employed by Ohio State Highway Patrol (OSP) since April 2017. I am currently assigned as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Cleveland Office and have been so assigned since November 2020. I was employed by the City of Wooster Police Department, Wayne County, Ohio, prior to being employed as a StateTrooper. I have a Master of Science degree in Criminal Justice Administration and Management. I have received specialized training at the Ohio State Highway Patrol Trooper Academy, the Medina County Law Enforcement Training Academy, and the Ohio Peace Officer Training Academy (OPOTA). I am currently certified as a State Trooper and am an OPOTA Certified State of Ohio Instructor and have been so since 2014. I have received training regarding the

identification of controlled substances and the operation of drug trafficking individuals and organizations. I have further received training in the identification, organization and various ways drug trafficking organization's structure and mask their operations.

3. I have been involved in investigating numerous individuals involved in the manufacturing, distribution, and use of controlled substances in both the United States and Foreign Countries. I have successfully conducted investigations that have resulted in drug traffickers' arrests and the seizure of significant quantities of drugs, money, and weapons both inthe United States and foreign countries. I have surveilled drug traffickers' operations and have interviewed numerous persons personally involved in the sale, transport, and use of narcotics. Through this training and experience, I have become familiar with and have gained a thorough understanding of the methods, manner, and means used by individuals engaged in the unlawful manufacturing, trafficking, transportation, and use of controlled substances.

4. I have gained knowledge that members and co-conspirators of complex drug trafficking organizations utilize various veiling methods and engage in activities in efforts to thwart the efforts of law enforcement personnel. In particular members of drug trafficking organizations commonly utilize multiple cellular phones and subscribe said phone numbers in the names of fictitious people or relatives. Members also utilize numerous vehicles, and exchange vehicles at irregular intervals, with said vehicles being registered to relatives, fictitious companies, or in the names of invented individuals. I also have experience recognizing members of drug trafficking organizations engaging in driving maneuvers that are designed to assist criminals in the possible identification of law enforcement personnel who are engaging in surveillance operations. I also know drug

traffickers use multiple residences in an effort to thwartlaw enforcement by separating the fruits of the crimes, to different locations. I know it is common for drug traffickers to use apartments, in order to blend in with multiple other residences, making it difficult for law enforcement to locate their location. All of these activities are done in the hope that criminal activities will be disguised.

5. I have conducted numerous analyses of billing and toll records for telephones used by drug traffickers. I know drug trafficking is often furthered by using multiple cellular phones, multiple insulated contacts,and pre-paid cellular phones, which is also known as compartmentalization. The use of the telephones in this manner is designed to help avoid detection by law enforcement.

6. I know based upon training and experience that drug trafficking and money laundering organizations routinely use a number of other operational techniques, designed and implemented to achieve two goals: first, the successful distribution of controlled substances and the subsequent collection of the proceeds of that illegal activity; and second, the minimization ofthe exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

7. I have participated in multiple drug cases, some of which have been Title III investigations, involving drug trafficking activities and have become familiar with the patterns ofactivity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings.

8. I also know from training and experience that drug traffickers periodically change, or "drop," their telephones and/or telephone numbers in an attempt

to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

9. This Affidavit is based on my observation and those of other officers. This Affidavit does not contain every piece of information known to me and other investigators, but rather only information sufficient to establish probable cause to support the requested warrant.

## EXECUTIVE SUMMARY

10. This is an affidavit in support of a complaint and arrest warrant for MUSTAFA and SANABRIA. Agents with DEA San Antonio, DEA Cleveland, FBI Laredo, FBI Cleveland, USPIS Newark, and USPIS Cleveland have been investigating MUSTAFA, SANABRIA, and others, as part of a large fentanyl trafficking conspiracy, involving fentanyl-paper soaking laboratories. Federal agents in Texas have dismantled multiple fentanyl-paper soaking laboratories and have identified MUSTAFA and SANABRIA to be responsible for sourcing fentanyl to the Texas laboratories. During a search warrant execution on February 26, 2025, MUSTAFA and SANABRIA were located in a home that was functioning as a laboratory and in which they possessed controlled substances with the intent to distribute.

## PROBABLE CAUSE

### A. Initial Investigation

11. Around December 2022, San Antonio DEA began investigating inmates and correctional officers involved in the introduction of drugs and other contraband into Texas prisons. Much of the investigation related to the introduction into these prisons of fentanyl-soaked paper[1]. Other agencies, including DEA Cleveland, FBI Laredo, FBI Cleveland, USPIS Newark, and USPIS Cleveland joined the investigation.

12. On November 1, 2023, thirteen members of a drug trafficking organization (DTO) were indicted in the Western District of Texas on drug trafficking and money laundering charges relating to this scheme.

13. The analysis of the cellular device of one of the indicted DTO members was conducted with the goal of identifying the fentanyl source of supply. Investigators learned that one DTO member, while incarcerated and using a contraband cell phone, coordinated bulk purchases of fentanyl from a source of supply in Cleveland, Ohio. This source was only identified in these messages by their CashApp handles and a Zelle user email address.

### B. iCloud Search Warrants and Identification of SANABRIA and MUSTAFA

14. By July 2024, agents identified MUSTAFA as the user of the CashApp handles and the Zelle user email address. Agents also identified SANABRIA as the owner of the bank account which collected all the aggregated funds derived from the peer-to-peer payment platforms.

1 Fentanyl-soaked paper is a new method of drug contraband favored in correctional facilities due to the concealment a sheet of paper provides. Due to the potency of fentanyl, criminals will mix fentanyl with liquid synthetic cannabinoids to balance the dosage before soaking the mixture into sheets of paper. Liquid synthetic drugs are favored due to their liquid state and ability to absorb into sheets of paper. Fentanyl is also favored due to the small amounts needed. Other drugs such as methamphetamine or cocaine are not favored because the amounts needed to reach potency alter the appearance of the paper and thus render the paper easily detectable.

DEA was able to identify the phone numbers assigned to each account. Agents then identified multiple iCloud accounts assigned to each of these phone numbers. A search warrant seeking the data stored on the iCloud accounts belonging to SANABRIA and MUSTAFA was later issued by U.S. Magistrate Judge Elizabeth Chestney of the Western District of Texas.

15. During analysis of the iCloud account assigned to MUSTAFA, agents located a screenshot depicting a bitcoin cryptocurrency payment. The screenshot included the remitting wallet address and the receiving wallet address. Records indicate that the receiving wallet belongs to a Chinese chemical source of supply (SOS). Electronic communications between the Chinese SOS, MUSTAFA and SANABRIA indicate the Chinese SOS to be openly marketing the sale and importation of precursor chemicals to both MUSTAFA and SANABRIA. These messages also indicate the Chinese SOS's only accepted form of payment was cryptocurrency.

**16.** During analysis of the iCloud data, agents discovered a substantial amount of media depicting SANABRIA and MUSTAFA manufacturing bulk quantities of synthetic cannabinoids and fentanyl-soaked sheets of paper.

**17.** Agents also located a video showing fictious religious mail SANABRIA crafted to conceal the fentanyl-soaked paper before it was likely mailed to the inmate customers. Agents discovered this very same concealment method also being used by the DTO in Texas.

**18.** Location metadata was extracted from the photos and videos from the iCloud accounts. Agents used the extracted latitude and longitude coordinates to identify the following addresses: an address in Cleveland, Ohio (TARGET PREMISES 1), believed to be a stash house location used to store bulk quantities of finished product and currency and where bulk

amounts of raw chemicals have been delivered, and an address in Fairview Park, Ohio (TARGET PREMISES 2), believed to be a fictious business front which houses the fentanyl-paper and JHW laboratory and is where bulk amounts of raw chemicals have been delivered. A third location, in North Olmsted, Ohio (TARGET PREMISES 3), was recently discovered by using vehicle trackers installed upon MUSTAFA and SANABRIA's vehicles. All three addresses are located within the Northern District of Ohio.

**C. iCloud Media Specific to TARGET PREMISES 1**

**19.** The latitude and longitude coordinates from the metadata of many of the photographs or videos plot to Target Premises 1. Some relate to bulk cash amounts and even include SANABRIA and/or a child dancing or playing in piles of U.S. currency.

**I.**





J.

**20.** Photograph I is a screenshot taken from a video which depicted a stack of finished fentanyl-soaked sheets of paper. It is necessary for traffickers and manufacturers to use gloved hands when handling the fentanyl-soaked sheets of paper. Doing so without gloves will cause expose the handler to doses of fentanyl. Photograph J is a screenshot from a lengthy video taken by SANABRIA as she processes the chemicals and mixes what is believed to be powder fentanyl (pictured in the white container in the background) into the liquid before the mixture is dumped into aluminum trays and sheets of paper were dipped and laid to dry.

**21.** MUSTAFA was incarcerated from January 24, 2023 – April 18, 2024. Electronic communications from the iCloud accounts demonstrate that MUSTAFA was using a contraband cell phone to communicate with SANABRIA. During that time, SANABRIA continued to operate the laboratory and sell the product.

**D. iCloud Media Specific to TARGET PREMISES 2**

**22.** The latitude and longitude coordinates from the metadata of similar photographs also plotted to TARGET PREMISES 2, including the below which show bulk materials used in the soaking of sheets with fentanyl and JWH-018, a synthetic canabanoid and Schedule I controlled substance:









**E. Search Warrants Executed at Target Premises**

23. On February 26, 2025, agents executed search warrants at TARGET PREMISES 1, TARGET PREMISES 2, TARGET PREMISES 3, and another target locations.

- At TARGET PREMISES 1, agents located both MUSTAFA and SANABRIA. Right after entry, agents saw MUSTAFA and SANABRIA retrieving bags of powder and emptying the contents into the toilet. Agents also located powder, reams of paper of the kind typically used for soaking, a gas mask typically used to work in hazardous conditions, and bulk cash, much of which was vacuum sealed. Powder from the floor near the toilet tested presumptively positive for cocaine. Powder on SANABRIA's shirt tested presumptively positive for cocaine. Lastly, a brownish rock-like substance that was already in vacuum-sealed bags also tested presumptively positive for cocaine. Each of these was a

preliminary test. The substances from each location will be tested by the Cuyahoga County Regional Forensic Science Laboratory.

- At TARGET PREMISES 2, agents located bulk amounts of chemicals and equipment. These chemicals and equipment are consistent with those seen used in soaking paper as described above. A picture of some of the chemicals and equipment is found below.



- At TARGET PREMISES 3, agents discovered bulk cash, which was vacuum sealed.

**CONCLUSION**

24. Based on the facts set forth in this affidavit, I submit there is probable cause to believe that on or about February 26, 2025, in the Northern District of Ohio, each of Thaer MUSTAFA and Elyssia SANABRIA committed a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), possession of a controlled substance with the intent to distribute. Affiant, therefore, requests that this Court issue a criminal complaint and arrest warrant for each.

Adam W. Anderson
Task Force Officer
Drug Enforcement Administration

This affidavit was sworn to by the affiant by telephone or other reliable electronic means after a PDF was transmitted by email, per Federal Rule of Criminal Procedure 4.1

February 27, 2025
DATE

James E. Grimes Jr., United States Magistrate Judge